UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MATTHEW WARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:17-cv-02557-JRS-MJD |
| ) | |
| HAT WORLD INC., ) | |
| ) | |
| Defendant. ) | |

**Entry on Cross Motions for Summary Judgment**

Plaintiff Matthew Ward worked as a Regional Loss Prevention Investigator ("RLPI") for Defendant Hat World Inc. He alleges that Defendant owes him and his fellow former RLPIs unpaid overtime wages under the Fair Labor Standards Act of 1938 (the "FLSA"), 29 U.S.C. § 201 *et seq*.[1] (Compl. ¶ 1.3, ECF No. 1-2.) The Court conditionally certified this opt-in collective action under the FLSA, 29 U.S.C. § 216(b), and six additional plaintiffs have joined. (*See* ECF Nos. 59, 63, 65, 66, 69, 71, 77.) Defendant moves for summary judgment, (Def.'s Mot. Summ. J., ECF No. 108), and Plaintiff moves for partial summary judgment, (Pl.'s Mot. Summ. J., ECF No. 110). At issue is whether Plaintiffs were employed in a bona fide administrative capacity and exempt from the FLSA's overtime requirement.

---

[1] Plaintiff Ward also alleges related claims under Washington state law. (Compl. ¶ 1.2.) Plaintiffs stipulate that Washington law does not differ from the FLSA for purposes of summary judgment. (Pl.'s Resp. 21, ECF No. 123.)

## Legal Standard

*A. Summary Judgment*

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the district court "must construe all the facts and reasonable inferences in the light most favorable to the nonmoving party." *Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017). However, the district court must also view the evidence "through the prism of the substantive evidentiary burden," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986), and does not draw "inferences that are supported by only speculation or conjecture," *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). To withstand a properly supported motion for summary judgment, the nonmovants "must do more than raise some metaphysical doubt as to the material facts; [they] must come forward with specific facts showing that there is a genuine issue for trial." *Id*. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*B. FLSA*

The FLSA requires employers to pay overtime wages for any hours worked in excess of 40 per week. But employers need not pay overtime to workers "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

Congress has delegated the Secretary of Labor to define "bona fide administrative capacity." *Id.* Department of Labor regulations provide that a worker is employed in an administrative capacity only if the worker is paid more than $455 per week and his primary duty is "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," 29 C.F.R. § 541.200(a)(2), and "includes the exercise of discretion and independent judgment with respect to matters of significance," *id.* § 541.200(a)(3).

The employer bears the burden to establish that an employee falls within the FLSA's administrative exemption. *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 869 (7th Cir. 2008). Determining whether the exemption applies "requires a thorough, fact-intensive analysis of the employee's employment duties and responsibilities." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012). "It is those day-to-day duties on which a proper analysis under the FLSA rests, not merely the parties' characterizations of those duties as involving discretion or not." *Id.* at 580.

## Discussion

It is undisputed here that Plaintiffs were each paid more than $455 per week. At issue in this case are the regulation's two "primary duty" requirements. Specifically, the parties dispute whether RLPIs' primary duty is (1) "office or non-manual work directly related to the management or general business operations" of Defendant and (2) "includes the exercise of discretion and independent judgment with respect to matters of significance."

*A. Primary Duty: The Character of the RLPIs' Job as a Whole*

Department of Labor regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). The inquiry is holistic, considering "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Id.* Relevant factors include the relative importance of the exempt duties, the amount of time spent on exempt work, and the employee's freedom from direct supervision. *Id.*

Defendant Hat World Inc. sells hats, apparel, accessories, and novelties at more than 1,000 "Lids" locations across the United States and Canada. (Campbell Decl. ¶ 4, ECF No. 4; *see also* Wagner Dep. 19:8–13, ECF No. 109-13.) In retail, "shrink" refers to the difference between the amount of cash or inventory reflected in the company's records and the actual amount of cash or inventory on hand. (Campbell Dep. 70:2–8, 74:17–75:8, ECF No. 111-2; Marshall Dep. 196:5–14; Watson Dep. 79:11–80:5.) The most common causes of shrink are external theft, internal theft, and administrative error. (Campbell Dep. 70:9–12.)

Defendant's Operations Division runs its retail stores. Its Loss Prevention Division assists the Operations Division by detecting shrink, identifying the causes of shrink, recovering as much shrink as possible, and taking corrective or preventative actions to prevent future losses. (Campbell Dep. 74:17–75:8.) As part of its Loss Prevention Division, Defendant employs 10 to 16 Regional Loss Prevention Investi-

gators, (Campbell Decl. ¶ 4.), with each RLPI responsible for a region comprising between 65 and 105 stores, (Watson Dep. 31:23–32:10, ECF No. 109-17; Marshall Dep. 68:23–69:4, ECF No. 109-8).

As part of the Loss Prevention Division, RLPIs do not sell hats, apparel, accessories, or novelties. Rather, considering the character of the RLPIs' job as a whole—as presented in RLPIs' testimony, the RLPI job description, RLPIs' performance evaluations and written warnings, and RLPIs' resumes—RLPIs' primary duty is to prevent, detect, and resolve shrink in their respective regions through audits and investigations. (*See* Wagner Decl. ¶ 14, ECF No. 116; Miller Decl. ¶ 14, ECF No. 117; Marshall Decl. ¶ 14, ECF No. 115; 3d Heidenreich Decl. ¶ 14, ECF No. 114; 3d Ward Decl. ¶ 14, ECF No. 113; 3d Watson Decl. ¶ 38, ECF No. 112; Miller Dep. 88:6–22; ECF No. 109-1 at 31, 34–42, 44–45, 88–90; ECF No. 109-7 at 3, 8–9, 11–13; ECF No. 109-9 at 2, 22–30; ECF No. 109-11 at 3–4, 7–8; ECF No. 109-14 at 2–3, 10–17, 34; ECF No. 109-16 at 16–21, 35–36, 38; ECF No. 109-18 at 2; ECF No. 110-8 at 2.)

RLPIs work with no immediate supervision, (Wagner Dep. 119:11–16; Ward Dep. 146:4–7), almost always without any other loss prevention employees present, (Heidenreich Dep. 24:5–13). Although RLPIs sometimes have "office days" when they are not traveling to stores in their region for audits and investigations, those days are not spent at a Hat World office. (Heidenreich Dep. 39:11 ("If I had an office day, it would have been at home.").) *See Verkuilen v. MediaBank, LLC,* 646 F.3d 979, 981 (7th Cir. 2011) ("[A] legal requirement to pay a worker a fixed percentage increase in his hourly wage if he works more than 40 hours a week doesn't fit a worker who

5

spends much of his work time off the employer's premises, where he can't be supervised and so if entitled to overtime would be tempted to inflate his hours."). The "office days" are important because "it was hard to plan things out if you didn't have a little bit of time to sit down and do that." (Heidenreich Dep. 40:13–15.)

The RLPIs' audit consists of scanning inventory and inspecting the store and its records for compliance with company policies. Defendant's stores differ in size, type of location (storefront, mall, kiosk, department store section, airport, arena, etc.), product mix, and security infrastructure. "Each store has kind of its own thing as a far as . . . what issues are happening at that store. But, yeah, I would try to talk with . . . the different partners to figure out what's going to be the best course of action going forward." (Miller Dep. 96:21–97:1.)

RLPIs set their own schedule and do not "always have the time to follow up on everything," so they prioritize. (Heidenreich Dep. 38:18–20; Marshall Dep. 219:7–11; Miller Dep. 87:14–21; Hammer Dep. 9:8–10:7, ECF No. 109-5.) RLPIs decide when to audit a given store based on various factors, including the time since its last audit, whether the store has high shrink, information provided by district managers, the store's geographic location relative to other stores scheduled for audit, and exception-based reports showing unusual (and potentially fraudulent) activity. (Marshall Dep. 192:11–193:3; Miller Dep. 46:18–47:6; Heidenreich Dep. 38:24, 48:11–15; Watson Dep. 16:16–23; Wagner Dep. 62:1–5.)

The exception-based reporting software "could run a broad spectrum of really whatever you wanted to look at, and it would flag parameters within that report that

6

you set." (Heidenreich Dep. 19:20–24.) "[R]eally it's limitless on what you want it to do." (*Id.* 20:5–6.) Some reports are run by analysts in the corporate office and sent to the RLPIs; others are run by the RLPIs themselves. (*Id.* 20:11–25, 21:6–9.) Due to differences in staffing patterns and product mix, not all types of reports are helpful for detecting misconduct at all types of stores. (*See* Wagner Dep. 32:13–33:14.) RLPIs create procedures for identifying and tracking fraudulent activity using exception-based reporting software. (Marshall Dep. 199:9–13.) "If you had any red flags on the reports, you would follow up on those red flags, whether that's watching video or interviewing employees." (Heidenreich Dep. 19:10–15.)

RLPIs also use audit timing itself as an investigative tool: "Some of the tools we would do [sic] is increase the frequency in the audits. So if I have . . . a bad audit today, I might say, all right, I'm going to come back in 30 days or 60 days to see what's there to try to shrink the time frame so I can see who might be involved." (Miller Dep. 97:2–7.) RLPIs may also decide to conduct an unannounced audit, especially where the RLPI suspects the store manager or the full-time assistant store manager of wrongdoing. (Wagner Dep. 87:2–17.)

Although RLPIs scan inventory as part of the audit, responsibility for scanning does not fall to RLPIs alone. Store employees help scan inventory during the RLPI's audit, (*see* Heidenreich Dep. 60:17–22), store managers conduct weekly "bulk counts" of their inventory, (3d Watson Decl. ¶¶ 12, 23), and district managers conduct their own audits. RLPIs recommend and train other employees to serve as authorized auditors. (Miller Dep. 123:11–16; ECF No. 109-18 at 12.) And for especially large stores,

7

RLPIs hire an outside service to scan the inventory. (Miller Dep. 55:23–56:15.) RLPIs determine which outside service to use based on the store's location and the service providers' relative quality. (Miller Dep. 57:7–19.)

The audit score "help[s] [RLPIs] define what category of shrink that store might be experiencing." (Heidenreich Dep. 52:14–53:1.) After the audit, the RLPI reviews the store's performance with the manager. For example, in his self-evaluation, RLPI Ward explained:

> During audits, I always take an extra hour or so with the store staff to explain and demonstrate how to decrease loss, by increasing sales. I work with the staff on techniques designed to decrease loss by utilizing aggressive sales. During this time I also include a lot of Q&A time. I strive to ensure that by the time I leave the staff feels empowered to approach potential customers in this same manner whether that customer intends to purchase something or not.

(ECF No. 109-1 at 39.) In most instances, RLPIs instruct store employees on compliance with company policies throughout the course of the audit. (Hammer Dep. 75:14–76:10.) RLPI Heidenreich "would always discuss the results of the audit with the stores," (Heidenreich Dep. 53:9–10), "to make sure that they understood what they missed and why it was missed," (*id.* 54:5–6). He "always provided an opportunity for [store managers] to ask questions" and "would explain how the policy worked." (*Id.* 54:10–17.) Similarly, RLPI Marshall would "have a conversation with a district manager [after every audit] and let them know the opportunities they're having at that particular facility and to issue out that correct amount of training." (*Id.* 149:14–18.)

"There [are] just too many factors that would come up during an audit" to estimate an average amount of time for a typical audit. (Heidenreich Dep. 60:10–13.) Those

8

factors include "[h]ow organized the store is, [whether] they were able to get enough people to the store to help out, the number of customers that would come in during the audit, [and] any investigative issues that might come up." (Heidenreich Dep. 60:17–22.)

The investigation process is "very specific on what the particular investigation would be. But generally you would run reports. If you had any red flags on the reports, you would follow up on those red flags, whether that's watching [CCTV] video or interviewing employees." (Heidenreich Dep. 19:10–15.) RLPIs usually decide independently whether to pursue an investigation. (*Id.* 92:19–21.)

Where the RLPI determines that an employee caused shrink—through, for example, theft, discount abuse, refund fraud, or timecard fraud—the RLPI attempts to elicit a confession and obtain a promissory note. The RLPI also files a police report where appropriate. The investigative interview is a "long, drawn-out process," and "some of the introductions . . . can take up to 45 minutes to do." (Heidenreich Dep. 26:7–9.) It involves "developing a rapport" with the suspect. (Heidenreich Dep. 26:12.) Investigations involve discretion, including determining whether a loss was due to negligence. (Marshall Dep. 125:15–126:22, 129:2–24.) Although all RLPIs were trained in the same investigative method, some "choose to use it and [some choose] not to use it." (Marshall Dep. 130:4–13.) "Sometimes I would reach out to my peers and say what do you think, do you have any ideas. Sometimes I would have peers do interviews for me because I had maybe a backed-up caseload or wanted a

9

different style or opinion with somebody. So it's really dependent." (Miller Dep. 93:8–18.)

The inventory, compliance audit, analytics review, and investigation are "all ways to generate information to come to a conclusion." (Miller Dep. 94:8–14.) That is, they are all means to "resolve shrink"—to "explain specifically who took what, when, where, how." (Miller Dep. 88:6–10.)

## B. RLPIs' Primary Duty Is Non-Manual Work Directly Related to Defendant's General Business Operations

RLPIs do not sell hats. They assist with the running or servicing of Defendant's retail business. "The phrase 'directly related to the management or general business operations' refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a). Other district courts have held that similar loss-prevention duties are directly related to retailer-employers' general business operations. *See Bradford v. CVS Pharmacy, Inc.*, 1:12-CV-1159, 2016 WL 6462053, at *4 (N.D. Ga. Oct. 27, 2016) ("It is also clear that Bradford did not participate in the sale of retail goods; he assisted in 'servicing' CVS's retail business by investigating and preventing shrink."); *Mullins v. Target Corp.*, No. 09 C 7573, 2011 WL 1399262, at *5 (N.D. Ill. April 13, 2011) ("It is undisputed that Mullins did not participate in render-

10

ing the service that Target offers to the public, which is the sale of retail goods. Instead, she assisted in 'servicing' Target's retail operations by investigating and preventing fraud and theft."). The Department of Labor has persuasively determined the same, finding that loss prevention "directly relates to the functional areas of accounting, auditing, and quality control discussed in 29 C.F.R. § 541.201(b)." Wage & Hour Div. Opinion Letter FLSA 2006-30, 2006 WL 2792444, at *3 (Sept. 8, 2006); *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' under our decision in *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade'[.]").

RLPIs' primary duty—preventing, detecting, and resolving shrink—is also nonmanual. Plaintiffs contend that they spent more than 50 percent of their time physically scanning inventory as part of their audits, so their primary duty was non-exempt, manual work. But the amount of time spent on a given activity is not dispositive of whether that activity is the worker's primary duty. 29 C.F.R. § 541.700(b); *see also Demos v. City of Indianapolis*, 302 F.3d 698, 704 (7th Cir. 2002) ("Calculating that more than fifty percent of his time was spent on duties that did not call for the exercise of discretion and judgment [the plaintiff] argues that the district court erred in finding him an exempt administrative employee. We reject this rigid approach.").

"Just because an employee may spend a significant portion of his time engaged in ministerial or routine tasks does not necessarily prevent the application of the administrative exception." *Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 538 (7th

11

Cir. 1999), *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965 (7th Cir. 2013). "Thus, for example, assistant managers in a retail establishment . . . may have management as their primary duty even if the assistant managers spend more than 50 percent of the time performing nonexempt work such as running the cash register. However, if such managers are closely supervised and earn little more than nonexempt employees, the assistant managers generally would not satisfy the duty requirement." 29 C.F.R. § 541.700(c). Notably here, RLPIs are not "closely supervised," and it is undisputed that the most important metric for evaluating RLPIs' performance is the percentage of shrink the RLPI resolved, not the amount of inventory the RLPI scanned. (Marshall Dep. 184:4–7; ECF No. 109-1 at 36 ("Work on going where the issues are and resolving the issues, minimizing and preventing, Matt. Not to minimize that aspect of the job, but you got the opportunity to come aboard because we replaced folks who primarily thrived at shooting physical inventories.")).

In addition, "[w]ork that is 'directly and closely related' to the performance of exempt work is also considered exempt work. The phrase 'directly and closely related' means tasks that are related to exempt duties and that contribute to or facilitate performance of exempt work. Thus, 'directly and closely related' work may include physical tasks and menial tasks that arise out of exempt duties, and the routine work without which the exempt employee's exempt work cannot be performed properly." 29 C.F.R. § 703(a); *see also id.* § 703(b)(6) ("However, because this work is necessary for analyzing the data and making recommendations, the work is directly and closely related to exempt work."). Scanning inventory—and thereby detecting shrink—is

just the first, necessary step "in furtherance of [RLPIs'] non-manual loss prevention tasks." *Bradford*, 2016 WL 6462053 at *4. It is therefore "directly and closely related" to performance of RLPIs' primary duty of detecting, preventing, and resolving shrink.

There is no genuine issue that RLPIs' primary duty is non-manual work directly related to Defendant's general business operations.

C. *RLPIs' Primary Duty Includes the Exercise of Discretion and Independent Judgment with Respect to Matters of Significance.*

RLPIs' primary duty includes the exercise of discretion and independent judgment with respect to matters of significance. Although supervisors and company policies provide guidance for when to audit a given store, RLPIs "apply a measure of strategic analysis to their work," and prioritize their audits and investigations based on several factors to most effectively prevent, detect, and resolve shrink. *See Schaefer-LaRose*, 679 F.3d at 581. RLPIs "spend the vast majority of their time entirely unsupervised. Although they keep extensive records, through which management can and does monitor their progress, neither the fact that management reviews their work nor that they are required to keep such records detracts from the discretion they exercise in the core of their workday." *Id*. RLPIs determine whether to initiate an investigation and, in the course of their interviews, exercise at least as much discretion and judgment as the pharmaceutical sales representatives in *Schaefer-LaRose* exercised in

13

their physician interactions. *See Schaefer-LaRose*, 679 F.3d at 581 (noting that although "the companies gave the representatives precise wording and materials, they certainly did not treat the representatives as simple mouthpieces reciting scripts.").

Other district courts have held that loss-prevention duties like the RLPIs' duties include the exercise of discretion and independent judgment. *See Juback v. Radioshack Corp.*, 8:08-cv-768, 2009 WL 1259990, at *3 (M.D. Fla. May 6, 2009) ("Plaintiff chose how to conduct those investigations and audits for 263 stores throughout central Florida. These investigations were all unique and required Plaintiff's judgment in their execution[.]") (record citations omitted); *Bradford*, 2016 WL 6462053, at *6 ("And while it is undisputed that he had to obtain approval from his supervisors at various steps throughout his investigations, the Plaintiff's testimony demonstrates that he also made decisions that were free from immediate supervision."); *Mullins*, 2011 WL 1399262, at *6 ("when she initially reviewed and analyzed data from the stores in her area, she made a judgment about whether particular data or a pattern in the data warranted further investigation"); *id.* at *7 ("Mullins exercised independent judgment and discretion not only in selecting cases and planning out strategies and tactics for investigations, but in carrying out those investigations."). And the Department of Labor has found the same. FLSA 2006-30, 2006 WL 2792444, at *4 ("Working independently shows that the LPM has certain decision-making authority that is 'free from immediate direction or supervision.' In selecting appropriate steps

to address the problem of inventory shortage and pursuing the selected course of action, the LPM compares and evaluates possible courses of conduct, and acts or makes a decision after the various possibilities have been considered[.]") (citation omitted).

Moreover, RLPIs exercise that discretion and judgment with respect to matters at least as significant as the matters in *Roe-Midgett*. In that case, the plaintiffs were Material Damage Appraisers (MDAs) for a claims processing service. The plaintiffs were "responsible for investigating auto accident damage, making repair or replacement determinations, drafting estimates, and settling claims of up to $12,000 where liability has been established and coverage approved." *Roe-Midgett*, 512 F.3d at 868. "When MDAs inspect a vehicle for damage, they must exercise independent judgment to verify whether the actual damage is consistent with the claimed damage. In doing so, the MDA must evaluate whether the damage is likely preexisting, inconsistent with the alleged cause, or otherwise suspicious. The MDA must also be on the lookout for fraud when interviewing the claimant and any witnesses. These are judgment calls with respect to matters of significance. . . . While MDAs do not make final liability decisions, their assessment of the damage and its cause bear directly on the ultimate coverage determination." *Id.* at 874. Here, Plaintiffs' assessment of the shrink and its cause bear on personnel decisions (whether the loss was due to employee dishonesty or negligence or a simple shipping/receiving error) and result in recovery or prevention of thousands of dollars of losses to Defendant.

Furthermore, other district courts have held that similar loss-prevention duties include the exercise of discretion and independent judgment with respect to matters

15

of significance. *See Mullins*, 2011 WL 1399262 at *8 ("The investigations that Mullins conducted and sometimes led had the potential to, and in some instances did, recover significant assets for Target."); *Bradford*, 2016 WL 6462053 ("as an employee that helped 'determine the root cause of losses and develop solutions to prevent their reoccurrence,' the Plaintiff exercised discretion with regard to matters of significance.").

There is no genuine issue that RLPIs' primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

### D. *Defendant Has Proven RLPIs Are Employed in a Bona Fide Administrative Capacity*

Considering RLPIs' job holistically, there is no genuine issue that RLPIs' primary duty is non-manual or office work that directly relates to Defendant's general business operations and includes the exercise of discretion and independent judgment with respect to matters of significance. Plaintiffs were therefore employed in a bona fide administrative capacity, and Defendant is entitled to summary judgment on Plaintiffs' FLSA claims.

### E. *State Law Claims*

Plaintiffs stipulate for purposes of summary judgment that the relevant standards under Washington law do not differ from the FLSA. (Pls.' Resp. 21, ECF No. 123.) Because Defendant is entitled to summary judgment on Plaintiffs' FLSA claims, it is also entitled to summary judgment on Plaintiff Matthew Ward's claims under Washington law.

## Conclusion

For the reasons explained above, Defendant's Motion for Summary Judgment (ECF No. 108) is **granted**, Plaintiffs' Motion for Partial Summary Judgment (ECF No. 110) is **denied**, and Plaintiffs' claims are **dismissed** on the merits with prejudice. Final judgment will be entered separately.

Date: 9/30/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana


Distribution:

Bonnie Keane DelGobbo
BAKER & HOSTETLER LLP
bdelgobbo@bakerlaw.com

Joel Griswold
BAKER HOSTETLER LLP
jcgriswold@bakerlaw.com

Scott J. McKay
LAW OFFICES OF SCOTT MCKAY
scottjmckay@hotmail.com

Marina Visan
CARSON & NOEL PLLC
marina@carsonnoel.com

Todd W Wyatt
CARSON & NOEL PLLC
todd@carsonnoel.com